Mosier v. Stoll et al.

In our opinion the court did not err in its conclusions of law in this case.

Judgment affirmed.

Filed June 4, 1889.

No. 13,621.

MOSIER v. STOLL ET AL.

LIBEL.—*Mitigation of Damages.—Pleading.*—Evidence in mitigation of damages is admissible under an answer of general denial.

SAME.—*Officer of Insurance Society.—Charge of Fraud and Embezzlement.—Justification.—Evidence.*—In an action for libel wherein it is alleged that the defendants, the publishers of a newspaper, charged the managers of an insurance company, of whom the plaintiff was one, with fraudulently conducting the concern and with embezzling the funds of the society, evidence of the business methods and practices of the society are competent evidence under a plea of justification.

SAME.—*Motive of Publisher.—Malice.*—If the defendants, in publishing the article complained of, acted from an honest motive to protect the public against impostors, or upon information tending to show that the plaintiff was engaged in a corrupt scheme to obtain and appropriate money for his own profit, this fact would rebut malice and reduce the damages.

SAME.—*Grounds for Inferring Truth of Publication.—Evidence.*—Circulars issued by the officers of the society, which contained false statements and furnished grounds for inferring that they were made to enable the plaintiff and his associates to secure and appropriate money belonging to the society, were admissible on behalf of the defendants, either in mitigation of damages or in justification of the publication.

SAME.—*Question for Jury.*—It being shown that considerable sums of money belonging to the society were falsely accounted for in statements sent out by its officers, it was for the jury to determine, from the position of the plaintiff as the president of the society, the active part he took in its affairs, and other facts, whether or not he fraudulently appropriated the money.

SAME.—*Entire Article to be Considered.—Examination of Witnesses.*—As an aid to the discovery and exhibition of the motive which influenced the author in writing and publishing an alleged libellous article, it is proper to refer, in the examination of witnesses, to all that was written, and it is also the duty of the court to consider the whole of the publication.

SAME.—*Non-Libellous Charge.—Intent of Author.*—If a publication does not contain a libellous charge, then, no matter what the author intended, no action will lie.

SAME.—*Meaning of Article.— When to be Determined by the Court and When by the Jury.*—Where the article is plainly unambiguous, the question of its meaning and character is for the court, but where a portion of an article is selected and declared on, and its meaning is ambiguous, then the question is for the jury.

EXAMINATION OF PARTY.—*Cross-Examination.—Competency of.*—A party who is examined as a witness at the instance of the adverse party, prior to the trial, under section 509, R. S. 1881, may also be cross-examined, and the cross-examination is competent evidence in his behalf.

ARGUMENT OF COUNSEL.—*Misconduct.*—An error of counsel in argument in stating a wrong conclusion, or drawing a mistaken inference from the evidence, does not constitute misconduct.

INSTRUCTIONS TO JURY.—*Refusal to Give.*—It is not error to refuse to give instructions asked, unless they are in terms correct.

From the LaPorte Circuit Court.

*J. M. Vanfleet,* for appellant.

*A. Anderson, M. H. Weir* and *D. J. Wile,* for appellees.

ELLIOTT, C. J.—The appellant's complaint, as it was originally framed, charged that the appellees had published a malicious libel, intending to injure the appellant, and " to hold him up to public scorn, contempt and ridicule." The entire article was set out, and the complaint, as it was first framed, seemed to charge that the whole article was false and libellous. At a subsequent point in the proceedings, the appellant withdrew from his complaint all specifications of the falsity of the charges contained in the article, except one. The record thus exhibits the withdrawal : " Said plaintiff also now dismisses and withdraws from the several paragraphs of the complaint each and every charge of libel against said defendants except that part of the article published, and

the words of the said paragraph of the complaint charging, that the plaintiff fraudulently appropriated the money and funds of said society to his own use, as in said paragraph set forth and alleged, hereby intending and confining the charge to said specific accusation." In order to understand the questions presented, it is necessary to set forth almost in full the article which the appellant charges was libellous. It reads thus:

"Though the 'Old Peoples' Mutual Benefit Society,' of Elkhart, may have 'glib talkers' in the field to take in the unwary, it is difficult to comprehend why any person of good sense can fail to discern the self-evident fraudulent character of this institution. The entire *modus operandi* upon which its business is conducted is suggestive of the snide performance. The 'O. P.' is nothing more and nothing less than an enterprise for putting money into the pockets of its managers.

"We have before us a little pamphlet issued by the 'O. P.' in 1884, containing the first annual report of that organization. On page 7 will be found the 'List of Losses Paid.' Below is a list of nine persons to whom losses were paid during the period named, all of them being residents of the State of Michigan. We give names and residence, the amount alleged and advertised to have been paid, and directly opposite the amount actually paid:

| | Amount Claimed Paid. | Amount Actually Paid. |
|---|---|---|
| Perry Wells, Charlotte | $1,250 | $900 |
| Alex. Adams, Homer | 250 | 200 |
| Wm. B. Walz, Marshall | 750 | 600 |
| Olive Hogle, Partelle | 750 | 525 |
| L. J. Smith, Charlotte | 1,500 | 918 |
| H. A. Lewis, Homer | 1,000 | 125 |
| F. B. Walworth, Reading | 2,000 | 1,200 |
| A. E. Bartholomew, Reading | 500 | 450 |
| F. G. Reynolds, Battle Creek | 1,500 | 850 |
| | $9,500 | $5,768 |

"The table from which the above names are copied con-

tains the names of sixteen persons to whom losses were paid. Of these sixteen persons we have the exact amounts actually paid to nine thereof. Messrs. Mosier and Lumbert advertise to the world that they paid these nine persons the aggregate sum of $9,500, when, in point of fact, these parties received but $5,768, a difference of $3,732.

"Now, to whom did this snug little sum of $3,732 go? To the managers of the 'O. P.' How do they manage this little snide operation? In this manner: The death of an insured person is reported to the company. Notices of assessment are sent out to the policy-holders. The assessment blanks are sent to the agents, or collectors, in the different localities in which the policy-holders reside. As these assessments are paid the amount is credited on the agent's blanks, who subsequently makes his return to the company at Elkhart. Now, instead of entering up on the books of the company all of the assessments paid, the ingenious and benevolent Mr. Lumbert makes a calculation just how much he ought to pay on such and such a loss, and then enters on the books just enough assessment returns to aggregate the amount he feels disposed to pay over to the insurer. The concern is so managed as to afford a fair pretext for delay. The insurer makes regular inquiries of the agent, and the expected answer failing to materialize, he finally concludes to make a journey and personally interview the philanthropic Lumbert. This good Samaritan invites the hopeful and eager insurer to figure up the amount credited on the books in favor of this particular policy. Let us take the case of Mr. Reynolds. His policy called for $1,500. Mr. Lumbert says, in his bland manner: '$850 is all that has been realized on this policy; you have paid in only so and so much; you make a good thing out of this; you ought to be satisfied with such a handsome return.' The insinuating manner of Mr. Lumbert, and the overwhelming logic of Hon. Cyrus F. Mosier rarely fail to have the desired effect; the insurer receives a check for the amount agreed upon, signs a receipt for the

full amount of the policy, surrenders the latter, and goes on his way rejoicing. Lumbert and Mosier then chuckle over the net profit made on this policy, and gleefully figure up the proportion of their individual swag. They next utilize the receipt of their latest victim to pull the wool over the eyes of gullible people in localities where their mode of doing business is not understood. A little later on the omitted assessment payments are also entered on the books, so that the record may be made complete for official inspection.

"Occasionally some fellow will become obstreperous, and threaten to 'blow up the concern.' If he chances to be a bright, smart sort of a fellow, with plenty of grit in his make-up, Lumbert and 'the other boys' will conclude that discretion is the better part of valor and come down with their ducats. But these cases are comparatively rare. Under the law no insurance can be drawn unless the would-be beneficiary has an insurable interest in the person insured. A goodly number of the policies issued by the ' O. P.' are of an unlawful character, the insurer either having no insurable interest in the person insured, or the insured person not knowing anything about a policy having been taken out on his or her life. In cases of this kind Lumbert & Co. hold a good hand. They can threaten to have the insurer arrested for forging the name of the insured person, and thus scare the insurer into the acceptance of whatever sum the ' O. P.' managers may set apart for the particular case."

It seems quite clear to us that this withdrawal completely deprived the complaint of validity, for we find no charge in the article that " the plaintiff fraudulently appropriated the money to his own use." The charge is that the sum of $3,-732 went to the managers of the society. The parts of the article directly bearing upon the point under immediate mention are these : " Now, to whom did this snug little sum of $3,732 go ? To the managers of the O. P." " Lumbert and Mosier then chuckle over the net profits made on the policy, and gleefully figure up the proportion of their individual

swag." These statements, when taken in connection with the other statements of the article, do not charge the appellant with fraudulently appropriating the money of the society, but with fraudulently obtaining money for the society and getting their share of it as members or managers. If we are right in this conclusion, then, as there was no cause of action, there was nothing upon which a verdict could be founded. But, waiving a decision of this point, we proceed to examine the other questions presented by counsel.

We have no doubt that the court did right in admitting evidence of the business methods and practices of the society, for, conceding that there is a sufficient complaint, the defendants, under their justification, had a right to get all the facts before the jury. If the manner of doing business was such as to enable the managers to obtain money and divide profits as charged, then the defendants had a right to evidence of that fact, for it tended to show that the charge was true. If, however, as appellant argues, the charge in the article is that he was guilty of embezzling the funds of the society, the evidence was competent, for it was necessary for the jury to have all the facts in order to determine whether the charge was true or false. It would not excuse the appellant if other agents or officers united with him in fraudulently appropriating the money of the society of which he was the president, for if the money belonging to the society was fraudulently appropriated, the appellant was guilty as charged, although he secured the money as one of the managers of the society. It was not necessary to prove by direct evidence that the appellant knew of the corrupt methods adopted, as that might be established by inference.

The general denial was one of the answers, and, under this plea, the defendants had a right to give evidence in mitigation of damages, and the appellant's counsel is, therefore, in error in assuming that the only evidence the defendants were entitled to give was such as sustained the pleas of justification. *O'Conner* v. *O'Conner*, 27 Ind. 69; *Waugh* v.

*Waugh*, 47 Ind. 580. Circulars issued by the officers of the society, even if they did not tend to prove matters in justification, might tend to mitigate damages, for, if the defendants, in publishing the article in their newspaper, acted from an honest motive to protect the public against impostors, or upon information tending to show that the plaintiff was engaged in a corrupt scheme to obtain and appropriate money for his own profit, this fact would rebut malice, and thus reduce the damages. Odgers Libel and Slander, 301 ; *Smith* v. *Scott*, 2 Car. & Kir. 580 ; *Davis* v. *Cutbush*, 1 F. & F. 487 ; *Duncombe* v. *Daniell*, 8 C. & P. 222 ; *Indianapolis Sun Co.* v. *Horrell*, 53 Ind. 527 ; *Heilman* v. *Shanklin*, 60 Ind. 424.

The circulars were, however, admissible under the pleas of justification, for they tended to prove that the plaintiff fraudulently received and appropriated money. They showed that considerable sums of money were falsely accounted for, thus supplying grounds for the inference that there was a fraudulent appropriation of money. It was for the jury to determine, from the position of the appellant as the president of the society, the active part he took in all of its affairs, and the other facts, whether he did or not fraudulently appropriate, as profits, money that ought to have gone to the payment of members of the society holding policies. The circulars did much more than " puff" the business of the society ; they contained false statements, which furnished grounds for the inference that they were made for the purpose of enabling the appellant and his associates to secure and appropriate money belonging to the society.

John B. Stoll, one of the appellees, was examined prior to the trial, under the provisions of section 509, R. S. 1881. The appellant, himself, introduced in evidence the direct examination of Mr. Stoll, and the appellees introduced the cross-examination. The appellant contends that the court erred in ruling the cross-examination competent. The appellant is in error ; the section of the code relied on provides that the " party may be examined as a witness," and this

clearly implies that the usual course, embracing a direct examination and a cross-examination, may be pursued. *Hope* v. *Balen*, 58 N. Y. 380.

It was proper to refer to the entire article, and for that purpose it was competent to ascertain the intention with which it was written and published. Odgers Libel and Slander, 302. The motive which influenced the author was an important element, and, as an aid to its discovery and exhibition, it was proper to refer in the examination of witnesses to all that was written ; and it was also the duty of the court and jury to consider the whole of the publication. But if we are wrong in the view we have taken, still the result will not be changed, for the appellant, himself, opened the way to the introduction of the testimony, and he is not in a situation to successfully complain that cross-examining counsel kept in it. *Gaff* v. *Greer*, 88 Ind. 122 ; *Lowe* v. *Ryan*, 94 Ind. 450 ; *Hinton* v. *Whittaker*, 101 Ind. 344 ; *Dinwiddie* v. *State*, 103 Ind. 101.

Complaint is made of the conduct of the appellees' counsel, in making the opening statement. The record thus exhibits the conduct of counsel, and the objection of the appellant :

" The counsel for the defence, in his opening statement, said, among other things, that the libellous article should be taken as a whole, and stated to the jury the contents of the article ; that in the article the defendants charge the plaintiff and his associates with owning and operating a fraudulent insurance company, and with swindling the insured ; but that plaintiff did not sue for that, but only sued for so much of the article as charged embezzlement or misappropriation of money, virtually admitting that the article in the main was correct, but claiming that the managers of the company had honestly divided among themselves the money which they had obtained by fraud.

" Mr. Anderson said that in the article mentioned defendants charged plaintiff and his associates with swindling ; that

they insulted plaintiff; that they spat in his face; that plaintiff did not resent the insult; he did not sue for that; but he brought the action only for so much of the article as charged plaintiff and his associates with making an unfair division of the spoils.

"Mr. Vanfleet then arose and objected to the last remark. Mr. Anderson then expressed his willingness to withdraw the remark if it wounded the feelings of plaintiff.

"Nothing more occurred in this connection; to all of which the plaintiff's counsel objected at the time, and requested the court to prohibit him from using such language, which the court refused to do, to which ruling of the court the plaintiff, by his counsel, then excepted."

We do not think there was such a material wrong, if, indeed, there was any wrong at all, as justifies a reversal. If the appellees' counsel was in error in stating what the appellant virtually admitted, his mistake was in drawing a wrong inference, or in stating an erroneous conclusion, and such mistakes do not constitute misconduct. *Proctor* v. *De-Camp,* 83 Ind. 559; *Brower* v. *Goodyer,* 88 Ind. 572. There was no misstatement of a fact, so, conceding that appellant's counsel is right in asserting that all that was not denied was not admitted, there was nothing more than an error in stating the speaker's judgment, inference, or conclusion.

The instructions of the court are models of perspicuity, strength and accuracy. They gave the law to the jury with unusual force and precision. The criticisms of counsel are without foundation.

It is not error to refuse instructions, unless they are in terms correct. *Goodwin* v. *State,* 96 Ind. 550.

The fifth instruction asked by the appellant is not a just statement of the law, since it assumes that there was no controversy as to the nature of the charge published by the appellees, and asserts that if the defendants did intend to charge the plaintiff with embezzlement, he is entitled to recover, un-

less the defendants have shown that he did appropriate the money. It is enough to say that this instruction was correctly refused, because the law is not, as it asserts, that if the author of an article intends to publish a libel, he does publish a libel; on the contrary, the law is that if the publication does not contain a libellous charge, then, no matter what its author intended, no action will lie. Odgers Libel and Slander, 93

If the complaint states a cause of action at all, it does so because the article published by the defendants charges the plaintiff with having fraudulently appropriated the money of the society to his own use. The article does not directly make such a charge, and we do not think that the court erred in refusing to instruct the jury that it does, on its face, contain such a charge. Where the article is plainly unambiguous, the question of its meaning and character is for the court; but where a portion of an article is selected and declared on, and its meaning is ambiguous, then the question is for the jury. *Gabe* v. *McGinnis*, 68 Ind. 538; *Over* v. *Schiffling*, 102 Ind. 191; *Donaghue* v. *Gaffy*, 54 Conn. 257; Townshend Slander and Libel, section 286.

The verdict is right, on the evidence.

Judgment affirmed.

Filed April 5, 1889; petition for a rehearing overruled June 4, 1889.